CAPITAL STATE BANK *v.* J. M. LEWIS ET AL. AND J. M. LEWIS ET AL. *v.* CAPITAL STATE BANK.

1. TAX-TITLE. *Validity of. Law applicable to.*
   The validity of a tax-title must be determined by the law as it existed at the time of the assessment and sale.

2. TAX SALE. *Validity of. Legality of levy.*
   A sale of land for taxes, a part of which was levied legally and a part illegally, is void.

3. SAME. *Place of. Levy of taxes. Board of supervisors.*
   A levy of taxes made by a board of supervisors while holding its session at a place where it was not authorized by law to hold a session is void, and a sale thereunder confers no title.

4. TAX-TITLE. *Setting aside thereof. Tender of taxes due. State of law in* 1875.
   In 1875 there was no statute in this State which required the owner of land sold for taxes to have paid or tendered to the tax collector before sale the amount of taxes legally chargeable on the land, as a condition precedent to his right to have the title invalidated on account of a part of the taxes being illegal. The statutes subsequently passed to that effect do not operate retroactively.

5. TAX SALE. *Failure of title thereunder. Right of purchaser to reimbursement for land sold in* 1875. *What necessary to support lien therefor.*
   On a failure of title to lands sold to the State for taxes in 1875, and purchased from the State by an individual in 1885, the latter still has a lien on such land for the amount of purchase-money and taxes paid out by him with interest and damages, as provided by § 1718, Code of 1871, if there was an effort by the proper officers to subject the land to sale for taxes due and unpaid; and no valid levy, assessment, or sale is necessary to support such lien.

6. SAME. *Lien of purchaser. Repeal of § 1718, Code of 1871, by act of* 1877.
   The repeal, by act approved February 1, 1877, of the statute securing such lien operated only on sales thereafter to be made, and did not affect liens existing, complete, and vested before such repeal.

APPEAL AND CROSS-APPEAL from the Chancery Court of Hinds County.

HON. E. G. PEYTON, Chancellor.

In March, 1875, the land here in controversy was sold to the State for the taxes of 1874. In May, 1875, this same land was

again sold to the State under what is known as the "Abatement Act," approved March 1, 1875. On March 30, 1885, Lewis & Nicholson purchased this land from the State, receiving a deed thereto in which it was set out that the land conveyed therein was acquired by the State at the sale in May, 1875. On July 17, 1885, the auditor executed another deed to this same land, conveying to Lewis & Nicholson the title of the State acquired under the sale of March, 1875. Lewis & Nicholson went into possession of the land on July 27, 1885. The "Capital State Bank," which claimed title to the land, brought an action of unlawful entry and detainer against Lewis & Nicholson. Thereupon Lewis & Nicholson filed this bill against the Capital State Bank, in which they prayed an injunction restraining the further prosecution of the action above referred to. This bill also sought to establish the validity of the title derived by complainants from the State, and if wrong in that, asked that a lien be established on the land in favor of complainants for the amount of the purchase-money and taxes they had paid out, with damages and interest as allowed by law.

The defendant answered, denying complainant's title and making its answer a cross-bill, setting up its own title, and asking to be put in possession of the land and to have complainant's tax-title cancelled. Defendant's answer also denied the right of complainants to assert a lien against the land for purchase-money, taxes, etc., paid out by them.

It was shown in evidence that the board of supervisors, when making the levy of the county taxes for which, together with the State taxes, the sale of March, 1875, was had, held their session in the city of Jackson in a private building.

The Chancellor found that complainants' tax-titles to the land are void; that they are entitled to be reimbursed in accordance with § 1718, Code of 1871, and to have a lien on the land for the amount so found to be due. From this decree both the complainants and the defendant appealed.

*D. Shelton,* for the appellant and cross-appellee.

1. Section 1697, of the Code of 1871, enacts, "that no lands shall be sold for taxes whereon any settler shall reside until the

collector shall have demanded payment of the taxes from him personally, or by written application left at his residence, containing numbers of the land and amount of taxes."

That provision was not repealed by the act of 1872, for it was not in conflict with that act, but in perfect harmony with it, and the repealing act of December 22, 1874, expressly revives the whole of § 1697 of the Code of 1871. My quotation is, therefore, strictly applicable to the sale of March 1, 1875, for the taxes of 1874, but these taxes were never demanded in either of the two ways named in my quotation, therefore the sale was void.

2. Another error fatal to all the proceedings by or before the board of supervisors is this: The board was never authorized by law to hold meetings in Jackson or anywhere but the court-house in Raymond until 1876. (Acts of 1876, p. 365.) But every meeting, from January, 1874, to March, 1875, both included, was at Jackson in a private building. There the taxes of 1874 were levied; there, if anywhere, the rolls were corrected; there the taxpayers had to go for relief if anything was wrong; there the delinquent list was returned, if anywhere; there had to be made and settled all objections and every dispute about taxes and their adjustment; there the rolls had to be examined and corrected; there the taxes had to be levied by the board; in short, there were no meetings of the board anywhere but at the private building in Jackson and nothing could be done except at it, and if done there it was void.

I shall not, in this case, controvert the idea that if it involved only *irregular execution* of a sale to enforce collection of *taxes levied and due* by enforcing a lien for those taxes levied and due, put into effect after proper notice, when there was no personal property to be distrained—in such a case, the right of subrogation would exist in the State, and my attack on that subrogation is founded on the facts that the land owed no taxes for 1874 to the State, nor did its infant owners, and the State had no lien to enforce against the land. See 55 Miss. 35; 56 Miss. 722–726; Blackwell on Tax-Titles 160, 161, and 437; 57 Miss. 78; 60 Miss. 477. The bank's defense is not founded on a de-

fective execution of a sale for a legitimate purpose; it is a denial that any such legitimate purpose existed against the land or its infant owners—a denial that any right to sell had accrued. 58 Miss. 632–3. But I may be told that by § 1718, of the Code of 1871, the court was compelled to give a decree on the cross-bill as it did, thus making the statutes a rule under which a landowner can never win, whether he owed any taxes or not. Surely this cannot be rightly claimed where the sale was made, though no taxes were due, or when the land was not subject to sale for taxes. I say that the prerequisite is that the sale must be made for taxes *actually* due the State and county, and the land, at the time it is sold, must be subject to sale for these taxes; the act itself so says, for it says that the sale must be for *for taxes.* There are no taxes on the property until it is assessed, and the taxes levied, moreover, the property must be subject to sale for taxes.

*D. Shelton* also made an oral argument.

*Nugent & McWillie,* for the appellees and cross-appellants.

In this case the appellant does not plead or rely upon the illegality of any part of the tax for which the land was sold, nor does he tender or offer to pay that part of the tax which is confessedly legal. The court below, considering evidence not germane to any issue in the cause, declined to confirm our tax-title because of this fact, thus coming to the rescue of the pleader and giving his client an advantage he had not sought. We had always understood that this could not be done because of the inviolable rule that the *allegata* and *probata* must correspond, and that all evidence not tending to establish any issue presented for decision was incompetent. On this account we do not notice the fact that the county tax, for for which the lands in controversy were sold, was not levied at the county seat, but at Jackson. We thought that a defense not set up in the answer could not be relied on at the hearing. *Bacon* v. *Ventress,* 3 G. 158; *Prewitt* v. *Corpwood,* 1 G. 369; *Harvey* v. *Morton,* 7 G. 411.

But what law governs our contract of sale? Accepting, for the present, the view that it was competent for the legislature to affect the title of the State by a repeal of the act of 1871, as found in the code

of that year, we insist that the defendant was in no position to take advantage of the illegality of part of the taxes for which the lands were sold. We hardly think this a just view to take of the question, but proceed to consider it for the purpose of ascertaining what would be its logical effect, and treat the subsequent statutes as applicable to the sales list of March, 1875.

The Code of 1871, § 1700, gives the form of deeds to be executed by sheriffs to purchasers of lands sold for taxes; and, by § 1698, provides that, in default of bidders at tax sales, lists of lands struck off to the State shall be made up and certified, and that "said lists of lands sold to the State shall be in lieu of conveyances, and shall vest title in the State to all lands embraced in said lists." The latter clause of § 1700 declares as follows: "And no such conveyance shall be invalidated in any court of this State, except by proof that the taxes for which said land was sold had been paid before the sale; and the tax collector's conveyance to individuals and lists of lands sold to the State shall be *prima facie* evidence that the assessment and sale, and all proceedings of sale, were valid." On the receipt by the auditor of such sales lists the State and county taxes therein mentioned are credited as paid to the collector by the auditor. This provision of the code is carried into the general revenue law of 1876. Acts 1876, p. 151, § 43. By § 10 of the act of 1877 (Acts, p. 6) it is extended by the insertion after the words "before the sale" of this paragraph: "or that the taxes were illegal in part, and that before the sale the taxpayer tendered to the proper officer the amount of the legal taxes due on said lands." As thus extended, the section is carried into the acts of 1878 and the Code of 1880. Code 1880, § 525; Acts 1878, pp. 47–48, § 42. Before the passage of the act of 1877 the court had decided that a sale of land for taxes when part of the tax was illegal was void and passed no title whatever to the purchaser. *Dogan* v. *Griffin*, 51 Miss. 784; *Shattuck* v. *Daniel*, 52 Miss. 836; *Gamble* v. *Witty*, 56 Miss. 26.

The whole policy of the State in respect to lands sold for taxes partly illegal was by the revenue laws of 1878 and 1880 radically changed, and a clear purpose developed to make the change per-

vade the whole domain of jurisprudence. Nor do we find this court unmindful of this policy or indisposed to effectuate it. In *Corbin* v. *Crittenden*, 62 Miss. 125, 135, it is said that "a sale for more than could be lawfully claimed for taxes and costs, if there was in fact such excess, did not invalidate the sale;" and in *Carter* v. *Hadley*, 59 Miss. 130, that "Confirmation of a tax-title could not be prevented upon the ground of the illegality of a tax, and tax-deeds shall only be held invalid, by reason of an excess of taxes demanded, when it is shown that the taxpayer tendered before sale the real amount due." In *McGehee* v. *Miller*, 60 Miss. 903, the sheriff, Miller, had seized a horse and buggy of the appellant for his unpaid taxes of 1882, part of which was illegally levied. Appellant tendered the true amount of the tax to the sheriff before the seizure of his property, but the tender was not continuous, nor was the true amount tendered on the trial of the case. This court says: "If the plaintiff relies on a tender of all that is due as entitling him to a return of his goods he must be ready to pay what is due, so that the court may order the money paid in and adjust the controversy by awarding the money to the collector and the goods to the plaintiff."

Are these statutes applicable to sales of lands made prior to their passage under pre-existing laws? As the statute required the tender of the legal taxes before the sale, and is in general terms quite displacing existing revenue laws, as far as this could constitutionally be done, we insist that a tender of the tax really due by the owner of the lands in and with the answer was indispensable to the maintenance of the defense, unless our case is to be determined, as we think it is, by the revenue law of 1871.

It is a general rule, founded in wisdom as well as in common sense, that in determining the validity of a tax-title the case must be governed by the law as it stood at the date of the assessment and sale; not part of the law, but the whole of it. Blackwell on Tax-Titles, 3d ed., p. 480, citing *Com.* v. *Veazie*, 25 Me. 359; *Eldrege* v. *Tibbitts*, 5 La. An. 380.

The foregoing argument disposes of the questions arising on our appeal. The only question involved in the appeal of the

Capital State Bank is, was the decree of the court right in impressing a lien on the lands in favor of the cross-appellants under § 1718 of the Code of 1871. Of this we do not think there ought now to be a difference of opinion. It is not considered in this case that the tax levy by the board of supervisors exceeded the limit prescribed by law ; the bald defense is that the levy was made at Jackson instead of at Raymond. The moral duty devolved upon the appellant remains unaffected. It is conceded law that those who paid their taxes under the same conditions are not entitled to recover them back from the State, not on the assumption that the county taxes illegally levied were not, to all intents and purposes, incapable of being collected by the collector, but that they were in effect a burden on the taxpayer and that it was his clear moral duty to pay them. If, therefore, the taxpayer could not recover them, how can it happen that one paying them in his stead should stand in a worse predicament ? *Cogburn* v. *Hunt*, 56 Miss. 722, and 57 Miss. 682, suited, we think, this case.

But the appellant contends that this section of the Code of 1871 was afterward repealed, and that any right we may have had ceased to exist. The answer to this suggestion might well be that the same section was afterward re-enacted, and if a repeal displaced our right, a revival of the law, it would appear, would restore what was lost. But this contention is not sound. Section 1718 of the code defined and fixed the right of the purchaser at tax sales where his title fails, and it needs *no* argument to demonstrate that this right thus conferred and paid for cannot be defeated or impaired. It became part of our purchase and part of our *contract* of purchase. It was integrated into our conveyance to the same extent as if actually incorporated into the sales list to the State and the auditor's deed to us. The Chancellor so held, and his decree was right if our title could not be maintained. The land was not exempt from taxation and the taxes were not paid. 58 Miss. 633.

*W. L. Nugent,* of counsel for the appellees and cross-appellants, argued the case orally.

ARNOLD, J., delivered the opinion of the court.

Generally, the validity of a tax-title must be determined by the law as it existed at the time of the assessment and sale. Blackwell on Tax-Titles 580. The sale in this case being made for taxes, a part of which was levied by the board of supervisors at a place at which it was not authorized by law to hold its sessions, was void, and conferred no title. *Johnson* v. *Futch*, 57 Miss. 73 ; *Gamble* v. *Witty*, 55 Ib. 26. But, on failure of the title, appellees still had a lien on the land for the amount paid to the State for the same, and for taxes subsequently paid thereon by them, and for damages and interest as provided by § 1718, of the Code of 1871, the law in force on the subject when the land was sold for taxes in 1875. Nether a valid levy, assessment, nor sale was necessary to support their claim for such lien. There was an effort on the part of proper officers to subject the land to sale for taxes, which should have been paid, but which had not been paid, and this was sufficient, on failure of title, to give the purchaser, either from the tax collector or the State, a lien on the land for reimbursement. *Kaiser* v. *Harris*, 63 Miss. 590 ; *McLaran* v. *Moore*, 60 Ib. 376 ; *Mayer* v. *Peebles*, 58 Ib. 628 ; *Cogburn* v. *Hunt*, 57 Ib. 681 ; *Cogburn* v. *Hunt*, 56 Ib. 718.

The repeal, by the act approved February 1, 1877, of the statute securing such lien, operated only on sales thereafter to be made, and did not affect liens existing, complete, and vested before the repeal. *Tucker* v. *Stokes*, 3 S. & M. 124 ; *Baygents* v. *Beard*, 41 Miss. 581 ; Sedgwick on Construction of Stat. and Const. Law 108, note. While the State held the tax title it might, by express provision to that effect, have relinquished or abolished the lien if it had desired to do so, and a subsequent purchaser from the State would have no cause to complain, but no such purpose is expressed in the repealing act of 1877.

At the time the land in question was sold to the State for taxes, there was no statute which required the owner of land sold for taxes, to pay or tender to the tax collector, before the sale, the amount of tax legally chargeable on the land, as a condition precedent to his right to have the title invalidated on account of a part

of the tax being illegal. The statutes subsequently passed, to that effect, are properly construed to operate prospectively and not retroactively.

*The decree of the Chancellor is right, and it is affirmed.*